BENJAMIN B. WAGNER
United States Attorney
SEAN C. FLYNN
Assistant U.S. Attorney
501 "I" Street, Suite 10-100
Sacramento, California 95814
Telephone: (916) 554-2700



FILED

FEB 1 8 2010

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
       DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,  )
                           )
            Plaintiff,     )   No. 2:10-cr-0059 LKK
                           )
       v.                  )
                           )   PLEA AND COOPERATION AGREEMENT
STEVEN JAMES KING,         )
                           )
            Defendant.     )
_____)

## I.

## INTRODUCTION

**A. Scope of Agreement:** The Information to be filed in this case charges the defendant, Steven James King ("King"), with causing the introduction or delivery for introduction of adulterated and misbranded food into interstate commerce with the intent to defraud and mislead in violation of 21 U.S.C. §§ 331(a) and 333(a)(2). This document contains the complete plea and cooperation agreement between the United States Attorney's Office for the Eastern District of California (the "government"), and the defendant regarding this case. This plea and cooperation agreement is limited to the United States Attorney's Office for the Eastern District of California, and

1

1  cannot bind any other federal, state, or local prosecuting,
2  administrative, or regulatory authorities.

3  **B. Court Not a Party:** The Court is not a party to this plea
4  and cooperation agreement. Sentencing is a matter solely within the
5  discretion of the Court, the Court is under no obligation to accept
6  any recommendations made by the government, and the Court may in its
7  discretion impose any sentence it deems appropriate up to and
8  including the statutory maximum stated in this plea and cooperation
9  agreement. If the Court should impose any sentence up to the
10 maximum established by the statute, the defendant cannot, for that
11 reason alone, withdraw his guilty plea, and he will remain bound to
12 fulfill all of the obligations under this plea and cooperation
13 agreement. The defendant understands that neither the prosecutor,
14 defense counsel, nor the Court can make a binding prediction or
15 promise regarding the sentence he will receive.

## II.

### DEFENDANT'S OBLIGATIONS

18 **A. Waiver of Indictment and Guilty Plea:** The defendant will
19 waive indictment by grand jury, and plead guilty to a one-count
20 Information, substantially in the form attached hereto as <u>Exhibit B</u>,
21 charging him with causing the introduction or delivery for
22 introduction of adulterated and misbranded food into interstate
23 commerce with the intent to defraud and mislead in violation of 21
24 U.S.C. §§ 331(a) and 333(a)(2). The defendant agrees that he is in
25 fact guilty of that charge and that the facts set forth in the
26 Factual Basis attached hereto as <u>Exhibit A</u> are true and accurate.

27 **B. Restitution:** The Mandatory Victim Restitution Act requires
28 the Court to order restitution to the victims of certain offenses.

The parties recognize that United States Probation will make a determination regarding the defendant's restitution obligation in this matter, however, the parties reserve the right to present evidence and arguments at the time of sentencing concerning the applicability or amount of any court ordered restitution obligation. If such restitution is ordered, payment should be by cashier's or certified check made payable to the Clerk of the Court. The defendant understands that this plea and cooperation agreement is voidable by the government if he fails to pay the restitution as ordered by the Court. Defendant further agrees that he will not seek to discharge any restitution obligation or any part of such obligation in any bankruptcy proceeding.

**C. Special Assessment:** The defendant agrees to pay a special assessment of $100 at the time of sentencing by delivering a check or money order payable to the United States District Court to the United States Probation Office immediately before the sentencing hearing.

**D. Agreement to Cooperate:** The defendant agrees to cooperate fully with the government and any other federal, state, or local law enforcement agency, as directed by the government. As used in this plea and cooperation agreement, "cooperation" requires the defendant: (1) to respond truthfully and completely to all questions, whether in interviews, in correspondence, telephone conversations, before a grand jury, or at any trial or other court proceeding; (2) to attend all meetings, grand jury sessions, trials, and other proceedings at which the defendant's presence is requested by the government or compelled by subpoena or court order; (3) to produce voluntarily any and all documents, records, or other

tangible evidence requested by the government; (4) not to participate in any criminal activity while cooperating with the government; and (5) to disclose to the government the existence and status of all money, property, or assets, of any kind, derived from or acquired as a result of, or used to facilitate the commission of, the defendant's illegal activities or the illegal activities of any conspirators.

If the defendant commits any crimes or if any of the defendant's statements or testimony prove to be knowingly false, misleading, or materially incomplete, or if the defendant otherwise violates this plea and cooperation agreement in any way, the government will no longer be bound by its representations to the defendant concerning the limits on criminal prosecution and sentencing as set forth herein. The determination whether the defendant has violated the plea and cooperation agreement will be under a probable cause standard. If the defendant violates the plea and cooperation agreement, he shall thereafter be subject to prosecution for any federal criminal violation of which the government has knowledge, including but not limited to perjury, false statements, and obstruction of justice. Because disclosures pursuant to this plea and cooperation agreement will constitute a waiver of the Fifth Amendment privilege against compulsory self-incrimination, any such prosecution may be premised on statements and/or information provided by the defendant. Moreover, any prosecutions that are not time-barred by the applicable statute of limitations as of the date of this plea and cooperation agreement may be commenced in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of

4

this plea and cooperation agreement and the commencement of any such prosecutions. The defendant agrees to waive all defenses based on the statute of limitations or delay of prosecution with respect to any prosecutions that are not time-barred as of the date of this plea and cooperation agreement.

If it is determined that the defendant has violated any provision of this plea and cooperation agreement or if the defendant successfully moves to withdraw his plea: (1) all statements made by the defendant to the government or other designated law enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal, whether before or after this plea and cooperation agreement, shall be admissible in evidence in any criminal, civil, or administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by the defendant before or after this plea and cooperation agreement, or any leads derived therefrom, should be suppressed. By signing this plea and cooperation agreement, the defendant waives any and all rights in the foregoing respects.

### III.

### THE GOVERNMENT'S OBLIGATIONS

**A. Incarceration Range:** The government will recommend that the defendant be sentenced to the bottom of the applicable Guidelines range for his offense as determined by the United States Probation Office.

**B. Acceptance of Responsibility:** If the United States

5

Probation Office determines that a three level reduction in defendant's offense level for his full and clear demonstration of acceptance of responsibility is appropriate under U.S.S.G. § 3E1.1, the government will not oppose such a reduction and will so move under § 3E1.1(b), so long as the defendant pleads guilty, meets with and assists the probation officer in the preparation of the pre-sentence report, is truthful and candid with the probation officer and the Court, and does not otherwise engage in conduct that constitutes obstruction of justice within the meaning of U.S.S.G. § 3C1.1, either in the preparation of the pre-sentence report or during the sentencing proceeding.

**C. Reduction of Sentence for Cooperation:** The government agrees to recommend at the time of sentencing that the defendant's sentence of imprisonment be reduced by up to 50% if he provides substantial assistance to the government, pursuant to U.S.S.G. § 5K1.1. The defendant understands that he must comply with paragraph II(D) of this plea agreement. The defendant understands that it is within the sole and exclusive discretion of the government to determine whether the defendant has provided substantial assistance. The defendant understands that the government may recommend a reduction in his sentence of less than 50% or no reduction at all, depending on the level of assistance the government determines that the defendant has provided. The defendant further understands that a motion pursuant to U.S.S.G. § 5K1.1 is only a recommendation and is not binding on the Court, that this plea agreement confers no right upon the defendant to require that the government make a § 5K1.1 motion, and that this plea agreement confers no remedy upon the defendant in the event the government declines to make a § 5K1.1

motion. In particular, the defendant agrees not to try to file a motion to withdraw his plea based on the fact that the government decides not to recommend a sentence reduction or recommends a sentence reduction less than the defendant thinks is appropriate.

If the government determines that the defendant has provided further cooperation within one year following sentencing, the government may move for a further reduction of his sentence pursuant to Rule 35 of the Federal Rules of Criminal Procedure.

**D. Limitation on Use of Information for Sentencing:** Other than as set forth above, the government agrees that any incriminating information provided by the defendant during his cooperation will not be used in determining the applicable Guidelines range in his case, pursuant to U.S.S.G. § 1B1.8.

**E. Fine:** The government agrees to recommend that the criminal fine imposed on the defendant, if any, be no higher than the bottom of the applicable fine range, given the defendant's offense level and sentencing range.

## IV.

### ELEMENTS OF THE OFFENSE

With respect to the sole count of the Information to be filed in this matter, which charges the defendant with causing the introduction or delivery for introduction of adulterated and misbranded food into interstate commerce with the intent to defraud and mislead in violation of 21 U.S.C. §§ 331(a) and 333(a)(2), at trial the government would have to prove beyond a reasonable doubt the following elements:

First, the defendant caused food to be introduced or delivered for introduction into interstate commerce;

7

Second, the food was adulterated or misbranded; and

Third, the defendant acted with the intent to defraud or mislead.

V.

**MAXIMUM SENTENCE**

**A. Maximum Penalty:** With respect to the sole count of the Information to be filed in this matter, which charges the defendant with causing the introduction or delivery for introduction of adulterated and misbranded food into interstate commerce with the intent to defraud and mislead in violation of 21 U.S.C. §§ 331(a) and 333(a)(2), the maximum sentence that the Court can impose is three years incarceration, a fine of $10,000, a one-year period of supervised release, and a special assessment of $100.

**B. Violations of Supervised Release:** The defendant understands that if he violates a condition of supervised release at any time during the term of supervised release, the Court may revoke the term of supervised release and require the defendant to serve up to one additional year of imprisonment.

VI.

**SENTENCING DETERMINATION**

**A. Statutory Authority:** The defendant understands that the Court must consult the Federal Sentencing Guidelines (as promulgated by the Sentencing Commission pursuant to the Sentencing Reform Act of 1984, 18 U.S.C. §§ 3551-3742 and 28 U.S.C. §§ 991-998, and as modified by United States v. Booker and United States v. Fanfan, 543 U.S. 220, 125 S.Ct. 738 (2005)) and must take them into account when determining a final sentence. The defendant understands that the Court will determine a non-binding and advisory Guidelines

8

sentencing range for this case pursuant to the Sentencing Guidelines. The defendant further understands that the Court will consider whether there is a basis for departure from the Guidelines sentencing range (either above or below the Guidelines sentencing range) because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. The defendant further understands that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

**B. Stipulations Affecting Guidelines Calculations:** The government and the defendant agree that there is no material dispute as to the following sentencing guidelines variables and therefore stipulate and agree to the following:

**1. Applicable Guidelines Section:** With respect to the charge of causing the introduction or delivery for introduction of adulterated and misbranded food into interstate commerce with the intent to defraud and mislead, the applicable Guidelines section is U.S.S.G. § 2N2.1. Because the defendant's causing the introduction or delivery for introduction of adulterated and misbranded food into interstate commerce was intended to defraud others, however, § 2N2.1(c)(1) requires the application of U.S.S.G. § 2B1.1 to the offense conduct.

**2. Base Offense Level:** Pursuant to both U.S.S.G. §§ 2N2.1(a) and § 2B1.1, the defendant's base offense level is 6.

**3. Specific Offense Characteristic:** Pursuant to U.S.S.G. § 2B1.1(b)(1)(G), the parties agree that at an evidentiary hearing

9

the government is currently in a position to prove, from evidence independent of that provided by the defendant, that the amount of loss attributable to the defendant's introduction of adulterated and misbranded food, and relevant conduct, is greater than $200,000, but less than $400,000. Consequently, the base offense level is increased by 12.

  **4. Acceptance of Responsibility:** See paragraph III(B) above.

  **5. Total Offense Level:** Pursuant to the foregoing stipulations, and assuming the defendant accepts responsibility for his conduct under U.S.S.G. § 3E1.1, the defendant's total adjusted offense level is 15.

  **6. Criminal History:** The parties agree that the defendant's criminal history is to be determined by United States Probation.

  **7. Departures or Other Enhancements or Reductions:** The parties stipulate and agree that they will not seek or argue in support of any other specific offense characteristics, Chapter Three adjustments or cross-references, other than those contemplated in the foregoing stipulations.

## VII.

## WAIVERS

  **A. Waiver of Constitutional Rights:** The defendant understands that by pleading guilty he is waiving the following constitutional rights: (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to subpoena witnesses to testify on his behalf; (e) to confront and cross-

examine witnesses against him; and (f) not to be compelled to incriminate himself.

**B. Waiver of Appeal and Collateral Attack:** The defendant understands that the law gives him a right to appeal his conviction and sentence. He agrees as part of his plea, however, to give up the right to appeal the conviction and the right to appeal any aspect of the sentence imposed in this case so long as his sentence is no longer than the top of the Sentencing Guidelines range determined by the Court consistent with the stipulations set forth above about the Sentencing Guidelines variables.

With the same limitations that may apply to any appeal, the defendant also gives up any right he may have to bring a post-appeal attack on his conviction or his sentence. He specifically agrees not to file a motion under 28 U.S.C. § 2255 or § 2241 attacking his conviction or sentence so long as the Court imposes a sentence no higher than the top of the Guidelines range determined by the Court consistent with the stipulations set forth above about the Sentencing Guidelines variables.

If the defendant ever attempts to vacate his plea, dismiss the underlying charges, or reduce or set aside his sentence on any of the counts to which he is pleading guilty, other than as set forth above in this section, the government shall have the right (1) to prosecute the defendant on any of the counts to which he pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this plea and cooperation agreement; and (3) to file any new charges that would otherwise be barred by this plea and cooperation agreement. The decision to pursue any or all of these options is solely in the discretion of the United States Attorney's Office. By

11

signing this plea and cooperation agreement, the defendant agrees to waive any objections, motions, and defenses he might have to the government's decision. In particular, he agrees not to raise any objections based on the passage of time with respect to such counts including, but not limited to, any statutes of limitation or any objections based on the Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment.

**C. Waiver of Attorneys' Fees and Costs:** The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the investigation and prosecution of all charges in the above-captioned matter and of any related allegations.

## VIII.

### ENTIRE PLEA AND COOPERATION AGREEMENT

Other than this plea and cooperation agreement, no agreement, understanding, promise, or condition between the government and the defendant exists, nor will such agreement, understanding, promise, or condition exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and counsel for the United States.

## IX.

### APPROVALS AND SIGNATURES

**A. Defense Counsel:** I have read this plea and cooperation agreement and have discussed it fully with my client. The plea and cooperation agreement accurately and completely sets forth the entirety of the agreement. I concur in my client's decision to plead guilty as set forth in this plea and cooperation agreement.

DATED: February 17, 2010

_____
ROGER NUTTAL
Attorney for Defendant

**B. Defendant:** I have read this plea and cooperation agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case. No other promises or inducements have been made to me, other than those contained in this plea and cooperation agreement. In addition, no one has threatened or forced me in any way to enter into this plea and cooperation agreement. Finally, I am satisfied with the representation of my attorney in this case.

DATED: February 17, 2010

_____
STEVEN JAMES KING, Defendant

13

C.  **Attorney for United States:**  I accept and agree to this
plea and cooperation agreement on behalf of the government.

DATED: February 17, 2010                BENJAMIN B. WAGNER
                                        United States Attorney


                                   By:  /s/ Sean C. Flynn
                                        SEAN C. FLYNN
                                        Assistant U.S. Attorney

**EXHIBIT "A"**
**Factual Basis for Plea**

At trial, the government would prove the following facts beyond a reasonable doubt:

Between 1994 and 2009, Steven James King ("King") was employed in a variety of positions, and most recently as Vice President for Operations, by SK Foods, L.P., a limited partnership with principal places of business in Monterey, California, and Williams, Ripon and Lemoore, California, in the Eastern District of California. SK Foods, L.P., and its related corporate entities ("SK Foods") was a grower and processor of tomato products and other food products, for sale to food product manufacturers, and food service distributors and marketers. During his tenure, King worked out of SK Foods' Lemoore, California facility in the Eastern District of California. As Vice President for Operations, King reported directly to SK Foods' owner and chief executive officer. In that position, King was responsible for overseeing and managing the operation of SK Foods' production facilities in Williams and Lemoore, California. During various periods King also assisted in overseeing and managing SK Foods' inventory of processed tomato and other food products, and arranging for the shipment of those food products to SK Foods' customers across the United States.

In the normal course, the market price of processed tomato products fluctuates based on the percentage of Natural Tomato Soluble Solids ("NTSS") that the product contains (also known as the product's "Brix value"). Customers frequently specify a required NTSS concentration in their contracts with manufacturers such as SK Foods. Customers will also often specify acceptable levels of other processed tomato product characteristics such as the product's pH, mold content, color, acidity and viscosity (sometimes referred to as "Bostwick"), depending on the customer's intended finished product (i.e., ketchup, salsa, barbeque sauce, etc.).

Additionally, during the relevant period SK Foods was subject to the United States Standards for grades of tomato paste and puree as established by the United States Department of Agriculture ("USDA"). SK Foods was further subject to Title 21, Code of Federal Regulations, Section 110.110 through which the United States Food and Drug Administration ("FDA") has established maximum limits of natural or unavoidable defects in foods sold within the United States, which present no health hazard. The limits are set out as Food Defect Action Levels. The limits prescribed by the Food Defect Action Levels represent thresholds above which FDA will take enforcement action for the food products being "adulterated" pursuant to 21 U.S.C. § 342(a)(3). For example, FDA has set a Food Defect Action Level for mold in tomato paste; if the mold count (as measured using the Howard mold count method) of all of the subsamples of a lot of tomato paste are higher than 40%, the FDA considers that product adulterated and unfit for sale within the United States.

To that end, during the relevant period SK Foods was required

15

to subject its processed tomato product to laboratory testing to ensure it complies both with applicable laws and regulations, and with customer specifications. In the normal course, SK Foods employees initially recorded the raw results of this testing process on handwritten lab result registers. The data was subsequently entered into a proprietary computer system owned and operated by SK Foods. When processed tomato products were shipped to customers, they were usually accompanied by a Certificate of Analysis ("COA"), which identified the particular grading factors (i.e., pH, mold count, color, viscosity and NTSS) derived from the SK Foods laboratory testing of the product. Additionally, SK Foods routinely affixed labels to the actual shipping containers carrying processed tomato product destined for customers. These container labels, along with the bills of lading and invoices accompanying a customer-bound shipment, typically identified the date of production and NTSS level of the processed tomato paste. Often times, duplicate copies of the documents described above also were faxed or mailed to SK Foods customers at the time of product shipment.

Beginning in at least 2004, and continuing until April 2008, it was a regular practice for senior leaders and directors of SK Foods to knowingly cause the falsification of the various grading factors and data contained on the COAs, bills of lading, invoices and bin labels (hereinafter, "quality control documents") that accompanied customer-bound shipments of tomato product, which was produced, purchased and sold by SK Foods. As Vice President for Operations, King falsified and directed other SK Foods employees to falsify these documents so that they reflected mold count levels in SK Foods' tomato product as being below the applicable Food Defect Action Level in many instances when, in fact, those levels were significantly above the federal threshold. In other instances, King falsified and directed other SK Foods employees falsify these documents so that they reflected inflated NTSS levels that were higher than what the tomato product actually contained, as well as altered pH, color, and viscosity values. One SK Foods employee that defendant King directed in this fashion was Jennifer Dahlman ("Dahlman"), a Reports and Business Analyst who, until February 18, 2009, worked in SK Foods' Lemoore facility in the Eastern District of California. King subsequently distributed and directed Dahlman and others to distribute such product, along with the falsified quality control documents, to certain of SK Foods' customers in interstate commerce.

King's actions described above were conducted at the express instruction, direction and with the assistance of other senior leaders and directors of SK Foods, and were intended to make it appear to SK Foods' customers as if particular shipments of processed tomato product were compliant with USDA and FDA standards, and with customer specifications, when in fact they were not. King's conduct, and the conduct of certain leaders and directors of SK Foods, was undertaken with the intent to defraud and mislead SK Foods' customers. As a result of such conduct, adulterated and misbranded processed tomato product was introduced into interstate commerce, and SK Foods' customers were fraudulently induced to pay for such product.

16

For example, during 2007, SK Foods experienced a period during which it was unable to provide an adequate supply of processed tomato paste containing 31% NTSS in order to meet its contractual obligations to certain customers. On January 3, 2007, SK Foods' former Vice President for Sales and Marketing Alan Huey, sent an email to various SK Foods executives, including King, which addressed product projections indicating that SK Foods' inventory of processed tomato product containing an NTSS level of 31% was significantly short, and that the company would be unable to meet its contractual obligations to many of its customers, including Kraft and McCormick and Company, Inc. ("McCormick"). A senior leader of SK Foods further suggested to others, including King, that the company falsify the quality control documents accompanying millions of pounds of processed tomato product containing lower NTSS levels of 25% and 28%, and ship those inferior products to satisfy SK Foods' outstanding obligations to customers for product containing 31% NTSS. At the direction of King and other senior leaders of SK Foods, Dahlman ultimately caused misbranded tomato product, and the accompanying falsified documentation, to be shipped during the spring and summer of 2007, via interstate carrier, from SK Foods' facilities in the Eastern District of California to McCormick and Kraft facilities in other states.

One such shipment occurred on or about May 18, 2007. On or about that date, Dahlman informed King that SK Foods did not possess processed tomato product containing 31% NTSS in order to meet its contractual obligations to McCormick. King subsequently directed Dahlman to misbrand tomato paste containing a lower NTSS level of 28%, and to ship that misbranded tomato product from its facilities in the Eastern District of California to a McCormick facility in South Bend, Indiana. The product was accompanied by certain quality control documents, which were falsified so that they misrepresented the tomato product as containing an NTSS level of 31%, when in fact it actually contained an NTSS level of 28%.

Defendant King's actions in this regard were conducted with the specific intent to defraud and mislead McCormick. As a result, McCormick unknowingly paid approximately 10.7% above market rate for the 28% NTSS processed tomato product, causing a loss to McCormick. Additional shipments of misbranded processed tomato product were sent to Kraft and McCormick during the spring and summer of 2007, with defendant King's knowledge, ultimately causing a loss to those companies in the approximate amount of $247,782.

King's conduct and the conduct of certain of his co-conspirators, as outlined above, violated 21 U.S.C. §§ 331(a) and 333(a)(2).